## BROWN S. S. CO. v. FONTANA S. S. CO. et al.

Circuit Court of Appeals, Sixth Circuit.
November 7, 1928.

No. 4835.

John B. Richards, of Buffalo, N. Y. (Brown, Ely & Richards and Laurence E. Coffey, all of Buffalo, N. Y., on the brief), for appellant.

Harvey D. Goulder, of Cleveland, Ohio (Holding, Duncan & Leckie, Goulder, White & Garry, Thomas H. Garry, and Lee C. Hinslea, all of Cleveland, Ohio, on the brief), for appellees.

Before DENISON and MACK, Circuit Judges, and MOINET, District Judge.

DENISON, Circuit Judge. Before daylight on September 18, 1925, the steamers Brown, down-bound, and Yosemite, up-bound, were in collision in Lake St. Clair. The Yosemite filed its libel against the Brown, which answered, and in turn filed its cross-libel. The Hurlbut Company, cargo owner on the Yosemite, also filed a libel against the Brown; the Yosemite was brought in as a party, and all these matters proceeded as one. The District Judge held the Brown solely at fault, and awarded damages to the Yosemite and to the cargo owner. The Brown appeals from these awards, and also from its failure to recover its collision damages.

The Brown had come down the St. Clair river, and the Yosemite up the Detroit river, into Lake St. Clair. The northern portion of this water is very shallow. There is a dredged channel, which is substantially a continuation of the St. Clair river and extends southwesterly into the lake. The upper part of this dredged channel is called the "canal," and is divided along the center by an earthen bank arising above the water. At the lower end of this bank the two parts unite into one channel, which has no above water banks, but continues, as a slight cut in the bottom of the lake, for 10,000 feet. At the lower end of the central bank or pier is a white light, and at its upper end, a mile and a quarter distant, a red light. These two lights may be and habitually are used as ranges, indicating the center of the dredged channel as it continues southwesterly in a direct line with the central pier. The dredged underwater channel is 700 feet wide at the upper end, widening to 800 feet at the lower. At a point 6,000 feet below the pier white light, the channel is marked by two buoys, on the east and west channel banks, and respectively showing at night red and white intermittent lights. They are called the lower buoys. The chart-marked course (S. 41.° W.) continues some 4 miles further, to a point at which, near the so-called midlake buoy, it swings westerly about half a point (to S. 47° W.).

There was a strong southerly wind blowing, following the Yosemite, whereby the smoke at frequent intervals obscured the lights. The two boats came together about 1,000 feet below the lower buoys. The starboard bow of the Brown struck the Yosemite's starboard bow very near the stem. The respective injuries were approximately similar and equal. The Yosemite backed away, the Brown passed on down the river, and the Yosemite swung to port under the Brown's stern and sank on the west channel bank.

It was the well-recognized, if not universal, custom for meeting boats on this range to pass port to port, each keeping within the right-hand half of the channel. It is the theory of the Yosemite—accepted by the District Court—that she had taken and maintained a position well upon the easterly or right-hand half of the channel (as constructively extended), and that the collision was caused by the Brown having come over into that water, where she had no right to be. It was the theory of the Brown that she had complied with a port to port whistle agreement, and had taken and held the westerly side of the channel, which was wrongfully invaded by the Yosemite.

It is at once apparent that whether the physical facts indicate the location where the collision occurred is naturally the first inquiry, in deciding which of these theories to accept. These facts are not demonstrative, but they tend to persuade. After the collision, the Yosemite, yielding the channel, backed away, while the Brown passed down. Then the Yosemite, filling forward, naturally looking for the nearest spot to go aground, swung over to the left channel bank and went ahead, until her bow, settling 2 or 3 feet, came to rest 200 feet beyond the nominal bank. If the Yosemite had been holding the center of the channel, and then, as she claims, had been for some time swinging to the right, she would have been well over toward the east bank, and apparently would have naturally gone aground on that side. Such swinging of her bow to port as the collision may have caused does not satisfactorily explain this selection of the nearest bank.

Coming to the direct and conflicting testimony: The witnesses for the Brown all agree that, coming down the west side of the canal and passing the white pier light, she swung to port slightly, so that, at a distance of half a mile, she was in range with the white and red lights, and that she then steadied on that range, which would be pre-

cisely the center of the channel, and then continued to swing to starboard until the collision. These range lights absolutely located the center of the channel, and the testimony that the Brown was observing them, did not go substantially east of the center, and was well over to the west before the collision, cannot be an unintentional mistake. Unless it may be rejected for some sufficient reason, it demonstrates that the Brown was in the proper location.

Against it, two things are suggested: One is that, if there had been a port helm as long as and as hard as the witnesses say, the boat would have been away out of the channel to the west. The testimony is not definite enough as to time and extent to justify this result. Three boat lengths made a quarter of a mile, and the helm movement appropriate for a safe meeting does not bring a quick turn. The other matter urged is that the Brown dragged on the bottom, and so must have been over against the east bank. We agree that the testimony of the Brown's engineer was intended to mean that he felt the boat scraping the bottom very briefly, not long before the collision, but the conclusion that they were over by the east bank does not follow. True, the testimony of a witness, speaking in 1926, said that at that time there was some shoaling in the easterly part of the east channel. Whether he intends to say that in the previous September this localized shoaling existed is not clear; but the danger that a boat drawing 18 feet 9 inches might scrape the bottom anywhere along here was obvious. The chart of 1923 shows that the channel had been originally dredged to 21.4 feet, based upon a certain low-water datum. The engineers' bulletins for 1925 indicate that there was frequent shoaling, requiring dredging to maintain the "project"; that the lake level had fallen below the water datum used in the chart; that the project depth was then regarded as 20 feet; that, in August, shoaling "below the lower end of the St. Clair Flats Canal has reduced the available depth so as to limit the draft to about 19 feet"; that dredging at this point was to occur at once; and that the lake level in September was 3 inches lower than in August. Under these conditions, the fact that a boat, drawing nearly 19 feet all around and naturally "squatting" some at the stern, should occasionally scrape the mud bottom, is no substantial proof that she was away over to the east, as against the positive testimony of every one above the deck.

The testimony from the Yosemite, that she was holding the center of the channel going up, is equally positive, until its basis is examined. The witnesses say that, after making the turn at the midlake buoy, they headed directly on the white pier light. They undertake to fix their precise distance from the midlake buoy as they passed and made the turn; but this would place them, all the time, at least 150 feet east of that center line of the channel on which they all insist they were moving, and so must be rejected. No one of them claims to have seen the second or red range light, and thus been able to fix the range line. They only say that they were following a course leading between—and they say midway between—the lower buoys to the white light. Running such a line from the white light down between the buoys would not indicate their lateral position, within a thousand feet. So far as their conclusion depends upon their sighting midway between the two buoys—which were lighted only intermittently and for a few seconds—it is manifestly unreliable. All the testimony of the Yosemite that the Brown was over to the east depends upon the supposition that the Yosemite was in the center, and, since the Yosemite witnesses had no satisfactory means of knowing that they were there, their basis is not established.

Upon the whole record, we think the conclusion must be that the collision took place well within the westerly half of the channel. Counsel have argued the question whether this meeting was to occur at such a place as to burden the Brown with the duty of electing which side to take. Under the general provisions of rule 17 of section 1 of the White Act (section 282, tit. 33, U. S. C. [33 USCA § 282]), it was the duty of each boat to keep to the right, unless the meeting was to occur in a narrow channel with a current, in which event section 289 (rule 24) permitted, or perhaps required, the down boat to elect. This meeting was to take place at just about the end of the dredged channel, where such little current as there had been was dissipated into the lake, and the boats became more affected by the wind than by the general water drift across the lake. We think the question does not require a decision, for, if the Brown was burdened with this duty, it was performed. The testimony fairly shows that the Brown sounded the one-blast meeting signal, which it describes as its second one, while the boats were still not less than a half mile apart. The witnesses for the Brown so insist, and there is nothing to the contrary, save an inference from the en-

gineer's log on the Yosemite that the time between the signal and the collision was not sufficient for the boats to cover this distance. This depends upon the time accuracy of those entries, to a measure of less than one minute, and it is not convincing.

We conclude that the Yosemite was in fault, since her officers, although knowing that the meeting must be port to port, if the Brown so elected, even if not in any event, yet went so far over to the wrong side of the channel that, when the signal was given and accepted, they found themselves unable to get across safely. We further conclude that the Brown also was in fault, not for being originally on the wrong side, but for not sooner appreciating that the boats were too far on each other's starboard, and too near together along the course, to cross each other's bows in safety; indeed, the only excuse of the Brown for not noticing the imminence of danger in time to avoid it, by checking or even backing, instead of going ahead full speed, and by porting further, is that there was so much smoke as to obscure the vision until the Yosemite "loomed up out of the smoke less than 100 feet away." If this excuse is true, it was plainly reckless to continue, at full speed, into this smoke, on the assumption that the Yosemite would be able to get across.

We conclude that the damages should be divided, and the case is remanded for further proceedings accordingly. Appellant will recover the costs of the appeal.